TRUXTON WOOD *versus* HORATIO G. KELLEY & SAMUEL NOYES.

In a conveyance of land, bounded on a fresh water pond, which had been permanently enlarged by means of a dam at its mouth, the title extends to the low water mark of the pond, in its enlarged state.

To establish a right by user, to flow water upon a complainant's land, in a case where the defendant's proof showed that the only interruption to the flowing was during the rebuilding or repairing of the dam, it must be proved that damage was done thereby to the landowner ; that the damage must have been such as would enable him to maintain a process to prevent such flowing or to recover for it ; that the damage should be of yearly occurrence ; that he knew or had the means of knowing of such flowing ; and that it must have been continued for twenty years, and that for that period it was flowed as high or higher than during the three years next before filing the complaint ; with the qualification, however, that the omission to flow during the time while the dam was being rebuilt or repaired, should not prevent the acquiring of such right.

In a complaint for flowing, one of the respondents, after being defaulted, cannot be used as a witness for his co-defendant.

" THIS was a complaint for flowing plaintiff's land by a dam erected by defendant, on a stream at the outlet of South pond. The land flowed was on said pond about two miles north of the dam.

" The complaint was filed August term, 1843. Noyes was defaulted in the District Court. The action was brought by Kelley into this Court by appeal. The general issue was

pleaded ; it was also pleaded that the plaintiff was not seized ; also that James Bowdoin and Henry Dearborn had a grant in 1783, from one William Vassal, the owner of the land, of the right of flowing it for the purpose of carrying a mill then about to be erected by said Bowdoin and Dearborn, from whom their right was transmitted to defendant, which grant was lost by time and accident, and that the defendant, or those under whom he claims, erected said dam and built said mills in the year 1784, and continued the same to the filing of this complaint ; also it was pleaded, that the defendant had a right to flow said land, by prescription, he and those under whom he claimed having continued to flow the same from the year 1784 to 1843.

"Plaintiff, to prove that he was seized of the land flowed, read in evidence the following deeds, viz : — A grant from the Proprietors of the Kennebec Purchase to William Vassal, dated Oct. 9th, 1771, a deed from Vassal to L. V. Borland, dated Jan'y 2d, 1787, and from Borland to D. Greene, dated Jan'y 18th, 1796, and from Greene to John Lowell, dated Nov. 2d, 1802. These deeds, among other lands, conveyed the north half of great lot No. 22. Plaintiff then read in evidence a deed from John Lowell to John Chandler, conveying all of said north half of No. 22, lying west of South pond, dated June 10th, 1803, and a deed from John Chandler to Elijah Wood of all that part of No. 22, which lieth west of said South pond, with the exception of a number of lots sold to others, dated March 29th, 1804, and a deed from said Elijah Wood to said complainant, dated May 2d, 1839, of 60 acres, part of said lot No. 22, bounded easterly on said South pond.

Defendant called several witnesses, whose testimony tended to prove that at the several times when said three last deeds were executed, said pond, upon which they were bounded on the east, was, by means of said dam, and for many years previous had been, raised to such a height as to cover the land, as flowed at the time of filing the complaint ; and contended, that the boundary expressed in said deeds, being *by the pond*,

it was the margin of the pond, *in its artificial state,* that formed the boundary in said deeds, which would exclude the land flowed ; and the defendant's counsel requested the Judge to instruct the jury : —

1st. " That the deed of John Lowell to John Chandler, and of John Chandler to Elijah Wood, and of said Elijah to the complainant, being bounded easterly by the pond, would be limited to the margin of the pond, as it was raised by the dam, at the several times when those deeds were executed.

2d. " That if the jury are satisfied that all the land, proved to have been flowed by said dam within the time alleged in said complaint, was situated to the eastward of said margin, in such case said complainant is not seizable thereof, and this complaint cannot be maintained.

" Under the 3d and 4th grounds of defence, defendant called many witnesses, whose testimony tended to prove, that said Bowdoin and said Dearborn erected said dam and mills in the year 1784 ; that said Bowdoin was the grantee of said mill lot and privilege from the Proprietors of the Kennebec Purchase, in the year 1770, and that his title to the land and mills, and privilege, had been regularly transmitted through sundry mesne conveyances to R. H. Gardiner, who leased the same to defendants. The testimony of said witnesses also tended to prove, that said dam had been kept up by successive owners and occupants from 1784 or 5 till 1820, and said mill had been in operation during the whole of said period, except when under repair or rebuilding ; and that the water was raised to as great a height on said land alleged to be flowed, during the whole of said period as it was during the time complained of in said complaint, doing damage to the owner of said land flowed, and the counsel for the defendant thereupon requested the Judge to instruct the jury, —

" That if the respondent and those, from whom he derived title to said mill and dam, exercised the right and privilege of flowing said land, proved to have been flowed by him, full twenty years uninterruptedly, from the time of its erection, doing thereby some damage to the owner of the land flowed,

however small, and without claim or disturbance, it furnished a legal presumption of a grant of a right so to flow.

" And said counsel further requested the Judge to instruct the jury, —

4th. " That, independent of such supposed grant, the fact of flowing such of plaintiff's land as is proved to have been flowed for any period of twenty years, doing damage to said owners and with their knowledge and without a claim for damages or disturbance by them, would confer upon said respondent, and those under whom he claims, a right to flow without payment of damages.

" The Judge declined to instruct the jury as requested, but did so instruct them, with the following qualifications; the first and second requested instructions were given accompanied with the remark, that the margin of the pond should be found for such purpose at low water mark ; the third and fourth requested instructions were given with the remark, that the flowing during the twenty years should be proved to have been as high or higher than during the three years prior to the time of filing of the complaint ; the third was further varied by stating that the flowing should have been so made as to exhibit a knowledge or means of knowledge of it to the then owner of the land ; and that the damage, " however small," should be such damage as would have enabled the owner of the land to maintain a process to prevent such flowing, or to recover for the damage occasioned by it. And the jury were instructed that they must be satisfied that such damage was occasioned during each year of the whole period of twenty years. But that the omission to flow during the time while the dam was being rebuilt or repaired, should not be considered as preventing the owners from acquiring such a right, those seasons being regarded as they would have been, had the flowing been continued.

" In the course of the trial, the counsel for said Kelley moved that said Noyes might be examined as a witness for him. This was objected to by counsel for complainant, and the motion was overruled by the Judge, and the said Noyes was rejected.

" A verdict was returned for the complainant and the defendant excepted."

*F. Allen* and *A. Belcher*, for defendant.

The dam was erected in 1784. It then raised the water as high as at any subsequent period. The six last successive conveyances, under which the plaintiff claims, were made while the water was thus flowed. When he took his deed the water had been kept thus raised for fifty-five years. A new margin to the pond had then existed all that time, and the land, concerning which the plaintiff complains, had been covered to the depth of four and a half feet.

The requested instruction was, that the margin of the pond, so enlarged, was the eastern boundary of the plaintiff's land under his deed. This point has never been precisely settled. The qualification annexed to the instruction was erroneous. It made a difference between high and low water marks. The rule is generally different from that. It has long been a part of the law, that lands, bounded by fresh water streams, extend to the centre. But in tide waters, the limit is at high water, both by the common law and by the civil law. 3 Kent's Com. 427, Lect. 52. Except under the Provincial ordinance, high water is the prevailing limit. But that ordinance only affected cases on tide waters. It does not reach this case. *Storer* v. *Freeman*, 6 Mass. 438. In this case there is an error in the report. The word " low" is there by mistake. It should read " high," otherwise the case is but contradiction and confusion. With that change the case would harmonize with Kent's views.

What was, by the common law, the boundary on tide waters, is now the boundary on fresh water ponds and lakes; that is, the margin formed by high water. Ld. Hale's Tr. de Maris, ch. 4, p. 5; Douglass, 446.

By the deeds under which the plaintiff claims, his land lies " west of the pond; which means, west of the pond, in its then artificial state. The deeds were made in the spring, when the water was high, and the land covered. This would destroy the seizin, so that nothing could pass below high water

mark, even if title extended to low water. *Hathorn* v. *Stinson*, 10 Maine, 224.

The case of *Rice* v. *Bradley*, 13 Maine, 198, which was of a natural pond raised by artificial means, settles that the boundary is at the margin of the pond in its enlarged state. In *Waterman* v. *Johnson*, 13 Pick. 261, it is obvious that (except for the parol testimony,) the boundary would have been fixed at high water mark of the pond, as it existed when the deed was made. The effect of the deed cannot be enlarged by construction. In tide waters there are two water lines. Not so in ponds and lakes. And when raised by a dam, the marginal line is still more permanent. In a pond there is no fixed low water mark. The ordinary state of the water to carry the mill is the true line.

If asked, who owns the land below the then high water mark? We answer, the man last seized.

If the Court had the power to enlarge the deed by construction, it could not be sound policy to do it. It would destroy the manufacturing interest to avoid a trifling inconvenience to the agriculturist. *Nelson* v. *Butterfield*, 21 Maine, 220; *Williams* v. *Nelson*, 23 Pick. 141; *French* v. *Braintree M. Co.*, 23 Pick. 216.

As to the points in the case, No. 3 and 4, we submit that the instructions were directly in opposition to *Nelson* v. *Butterfield*, before cited. What would have been the result, if the dam had been down a year or two? See *Dana* v. *Valentine*, 5 Metc. 8. It was there decided that the right of twenty years user was not defeated by two years of interruption.

If the flowing occasion a damage, *at any time* within twenty years, to the knowledge of the land owner, the right by the prescription is established.

Noyes ought to have been received as a witness. This is a suit in *tort*. He had been defaulted. He cannot protect himself. He was therefore competent to testify for Kelley.

*Evans* and *May*, for plaintiff.

SHEPLEY, C. J.— The case presented by the bill of excep-

tions arises on a complaint, authorized by statute, to recover damages for an injury occasioned by flowing the waters of South pond, upon land alleged to be owned by the complainant. His land is bounded " easterly on said South pond." If that boundary extends to low water line, it is not denied, that some part of his land has been flowed by reason of a mill-dam occupied by the respondents.

The defence rested upon two grounds. — First, that the complainant by his conveyance acquired no title below the water line of the pond at the time, when the conveyance was made.

Secondly, that the owners of the mill-dam had enjoyed the right to flow the lands to the same height for twenty years, and had thereby acquired the right to continue to do so ; and that a grant of that right was to be presumed.

South pond appeared to be a natural body of fresh water, the height and extent of which had been increased for more than twenty years, before the complainant purchased his land bounded upon it.

The jury were instructed, that the complainant acquired a title to the land bounded upon the pond, to the margin of the pond at low water mark, considering the pond to be permanently enlarged by reason of the mill-dam.

It is in argument insisted, that in analogy to the rule of law, which limits a conveyance of land, bounded upon the sea, or upon waters in which the tide flows and ebbs, to high water mark, the conveyance in this case should be so limited.

That rule appears to have arisen from the considerations, that the right of navigation upon such waters was a common right. That all the subjects or citizens of the country were entitled to navigate such waters, and that the use of the shore was essential to its full enjoyment. That the sovereign power could not have intended by a grant of land bounded upon navigable waters to infringe upon that common right. That the grantee could not have expected thereby to acquire a title, which would be in conflict with the most beneficial use of

that common right.   These considerations not being applicable to waters not navigable, conveyances bounded on streams of fresh water above the ebb and flow of tides were regarded as conveying the land *ad filum medium aquæ.*   The sovereign power can have no occasion to retain the title to soil around ponds between the lines of high and low water for any purpose of navigation.   The use of the waters of such ponds at all seasons is of great importance to the owners of the adjoining lands.   When the water is low, its use becomes more desirable and valuable.   As the title of the sovereign to a strip of land between the two water lines could be of no use to the public, no presumption can arise of an intention not to grant it.   Such waters are most valuable to the owners of land adjoining them for purposes, for which tide waters cannot be used.   Unless rebutted by some proof, the presumption is, that it was the intention of the parties to a conveyance of land bounded by a pond, that the land should be bounded upon it at all seasons of the year, and not while the pond remained only at the level existing at the time of the conveyance.

It is said that the Court has no power to extend the conveyance by construction.

It does not propose to do so ; but to decide, whether it was the intention of the parties to a conveyance of land, bounded upon a pond, that it should be bounded by it at all times, or only when the water was neither so high or so low as to be above or below a certain water line.   If the doctrine insisted upon were to be adopted, a person who received a conveyance of land adjoining a pond, when the water was quite low, might convey it to another at a more elevated and yet not high state of the water with a like boundary, and retain a small strip of land between those two water lines ; and there might, under the application of the doctrine, be several strips of land thus owned by different persons, when conveyances were made at several different states of the water.

No grantor or grantee can be supposed to have had an intention to produce such results.

Wood *v.* Kelley.

The instructions are supposed to be in conflict with the decision of this Court in the case of *Bradley* v. *Rice*, 13 Maine, 198. That case decided, that a conveyance of land bounded upon a pond formed, as the one referred to in this case is, partly of the waters of a natural pond and partly by waters accumulated by a dam erected at its outlet, was limited to the margin of the pond as then enlarged. It did not decide, whether such margin was to be found as it then existed or when the waters were high or low.

The opinion in the case of *Waterman* v. *Johnson*, 13 Pick. 261, states, that " a large natural pond may have a definite low water line, and then it would seem to be the most natural construction, and one which would be most likely to carry into effect the intent of the parties, to hold that land bounded upon such a pond would extend to low water line, it being presumed, that it was intended to give to the grantee the benefit of the water, whatever it might be, which he could not have upon any other construction."

It is not perceived, why the same presumption respecting the intention does not arise, when the land is bounded upon a natural pond after it has been for a long time enlarged by artificial means, and thereby determine, that the line of boundary is to be found at low water mark.

In the case of *Handly's Lessee* v. *Anthony*, 5 Wheat. 374, it was decided that the State of Virginia, when she ceded the territory north-west of the Ohio river to the United States, retained the whole bed of that river, and yet that the land on the north-west side of it was bounded by low water mark. MAR-SHALL, C. J. says, " wherever the river is a boundary between two States, it is the main, the permanent river, which constitutes the boundary ; and the mind will find itself embarrassed by insurmountable difficulty in attempting to draw any other line than low water mark." There will be found a similar difficulty, when a pond is the boundary. No other line can well be established by proof, when any considerable time has elapsed since the conveyance was made.

Vattel, when speaking of lakes, observes, " If some of the

lands bordering on the lake are only overflowed at high water, this transient accident cannot produce any change in their dependence. The reason why the soil, which the lake invades by little and little, belongs to the master of the lake and perishes with respect to the ancient proprietor, is, because the proprietor has no other limits besides the lake, nor any other marks besides its bank, to ascertain how far his possession extends." Vattel, B. & C. 22, § 273. This doctrine is alike applicable to large ponds, and if a line as permanently existing could be established at the margin of the waters at the time of the conveyance, its application to them would be excluded. Such line could not be varied by a permanent encroachment of the pond.

To establish a right to flow the lands of the complainant, the jury were by the instructions required to find, that the owners or occupants of the mill-dam had continued without interruption to flow the land for twenty years, doing thereby some damage each year. To establish an easement according to the common law, it would not be necessary to prove, that the owner of the land suffered damage. The reason for requiring it in a case like the present, was stated in the case of *Nelson* v. *Butterfield*, 21 Maine, 220.

The argument is, that such instructions must be erroneous, as they would prevent the owners of the mill-dam from obtaining a right to flow, if they had been prevented for one year only of the twenty, from flowing by a prostration of the dam by an extraordinary rise of water, or by a necessity to make repairs upon it, or to rebuild it.

Such a result was noticed, and the objection obviated, so far as the facts required that it should be, by instructions that the omission to flow during the time, while the dam was being rebuilt or repaired, should not be considered as preventing the owners from acquiring such a right, those seasons being regarded as they would have been, had the flowing been continued.

The case of *Dana* v. *Valentine*, 5 Metc. 8, cited and relied upon by the counsel appears to favor the doctrine, that twenty

entire years' adverse use, would not be required to establish the right, and that there might be a voluntary omission to exercise the right for about two of those twenty years.

A voluntary omission to exercise a right cannot afford evidence of a continued adverse claim or exercise of the right. There are to be found in the books some other cases, which would authorize the presumption of a grant of an easement or servitude upon the land of another by proof of an adverse use of it for a period short of twenty years. Such cases are at variance with the general current of authority and cannot, as Mathews observes, be supported.    Mathews on Pres. 363.

The case of *Moore* v. *Rawson*, 3 B. & C. 332, cited in the last case, recognizes the doctrine, that there must be proof of twenty years' adverse enjoyment of the flow of light and air to authorize the presumption of a grant.   It admits, that the right thus acquired, would be determined by a voluntary omission to exercise it without manifesting any intention to resume it.

Where land is not flowed, because the dam occasioning it must be repaired or rebuilt, that it may be useful, the very act of rebuilding or repairing, is the exhibition of an intention to maintain and to resume the exercise of the former use of it.

To acquire an easement or servitude upon the land of another, there must be proof of an uninterrupted and adverse use of it for twenty years, or, if such use be omitted for a time, evidence that such omission was not voluntary but unavoidable accompanied by the exhibition of an intention to resume the use as soon as practicable.   And when the right asserted, be that of flowing land in this state, it cannot be acquired without proof, that the land was thereby injured during each of those twenty years.   The reasons for this were sufficiently assigned in the case of *Nelson* v. *Butterfield*.

One of the respondents had been defaulted, and he was offered as a witness for the other and excluded.

If either branch of the defence had been established, it would have been effectual to prevent a maintenance of the

process, which the witness was directly interested to defeat. He was therefore properly excluded.

*Exceptions overruled.*

Note. — Wells, J. having been of counsel took no part in this decision.